### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **WENDELL GRIFFIN,** | * | |
| **808 Park Avenue** | | |
| **Baltimore, Maryland 21201** | * | |
| | | |
| **Plaintiff,** | * | **CIVIL COMPLAINT** |
| | | |
| **v.** | * | **JURY TRIAL DEMANDED** |
| | | |
| **BALTIMORE POLICE DEPARTMENT** | * | **Case No. _____** |
| **601 East Fayette Street** | | |
| **Baltimore, MD 21202,** | * | |
| | | |
| **JERRY LANDSMAN,** | * | |
| | | |
| **DONALD KINCAID,** | * | |
| | | |
| **and** | * | |
| | | |
| **EDWARD BROWN,** | * | |
| | | |
| **Defendants.** | * | |

_____

### NATURE OF ACTION

1.     This is a civil action for damages under 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b)

arising from an episode of premeditated police misconduct that resulted in Wendell

Griffin, an innocent man, spending over thirty years in prison for a crime he did not

commit.  This miscarriage of justice is the direct result of the efforts of homicide

detectives with the Baltimore Police Department ("BPD"), acting pursuant to the

policies and practices of their office, to suppress exculpatory evidence in connection

with the investigation and prosecution of Mr. Griffin for a Baltimore City murder that

took place in 1981.

2.    Mr. Griffin was convicted of first-degree murder and carrying a deadly weapon based on eyewitness testimony that was disputed at his trial in 1982.  During proceedings in 2011 on Mr. Griffin's petition for post conviction DNA testing of certain items of evidence, counsel for Mr. Griffin obtained police files pursuant to the Maryland Public Information Act that contained statements by two eyewitnesses who failed to identify Mr. Griffin in three photo arrays conducted by police.  Also discovered were other witness statements that contradicted the eyewitness testimony introduced by the State at Mr. Griffin's trial.  Further, evidence tending to show that others may have committed the crime – including statements that others were with the victim moments before his death – was similarly suppressed, depriving Mr. Griffin of the opportunity to construct an adequate defense.  Upon information and belief, the police detectives responsible for the investigation, Defendants Jerry Landsman, Donald Kincaid and Edward Brown ("the Detectives"), did not disclose the results of the photo arrays, the contradictory witness statements, or the evidence incriminating others to the State's Attorney's Office in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

3.    The newly discovered evidence showed that the Detectives suppressed direct, exculpatory evidence that Mr. Griffin did not commit the April 22, 1981, murder of James William Wise.  The internal police records produced for the first time in 2011 reveal that shortly after Mr. Wise was murdered on April 22, 1981, the police showed photo-arrays containing Mr. Griffin's picture to two key witnesses: Annie Wyche, who heard the shots fired that killed Mr. Wise and came within 8-10 feet of the shooter; and Mark Williams, who stumbled upon the crime scene immediately after the shooting and saw a person from 10 feet away dragging the body of Mr. Wise.

Both witnesses failed to identify Mr. Griffin.  Precisely because these statements excluding Mr. Griffin as the shooter directly contradicted the police theory that Mr. Griffin murdered Mr. Wise, the Detectives suppressed them.  In addition to suppressing direct, exculpatory eyewitness testimony, the Detectives also suppressed witness statements that contradicted a central aspect of the prosecution's circumstantial case against Mr. Griffin; namely, that he was observed before and after the murder of Mr. Wise in possession of a firearm.  Finally, the Detectives suppressed witness statements indicating that someone other than Mr. Griffin may have been responsible for the murder.

4.     On February 2, 2012, Mr. Griffin filed a Motion for Leave to Reopen Post Conviction and for Post Conviction Relief, based on the newly discovered eyewitnesses evidence that had been suppressed by the Detectives.

5.     On May 23, 2012, the Honorable Gail Rasin of the Circuit Court for Baltimore City, having indicated to the parties that she was prepared to order a new trial, granted an unopposed motion by the defense to modify Mr. Griffin's sentence to time served. After more than 30 years, Mr. Griffin was freed from custody.

6.     Mr. Griffin brings this lawsuit to seek redress for the wrongs inflicted upon him by the BPD and its Detectives over 32 years ago.

## PARTIES

7.     Plaintiff Wendell Griffin is a citizen of the State of Maryland and resides in Baltimore City.

8.     Defendant Baltimore Police Department is a local governmental entity in the City of Baltimore.

9.      Defendant Jerry Landsman was a Detective Lieutenant in the Homicide Division of the Baltimore Police Department with supervisory responsibility over the investigation into the murder of James William Wise.

10.     Defendant Donald Kincaid was a Detective in the Homicide Division of the Baltimore Police Department.

11.     Defendant Edward Brown was a Detective in the Homicide Division of the Baltimore Police Department.

## JURISDICTION AND VENUE

12.     This action arises under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States; 42 U.S.C. § 1983; and 42 U.S.C. § 1988(b).

13.     This Court has original jurisdiction over Plaintiff's constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

14.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. §§ 1391(b)(1),(2), and (3), because most or all of the Defendants reside and may be found in the District of Maryland and the events giving rise to these claims occurred in the District of Maryland.

## FACTUAL ALLEGATIONS

### The Murder Investigation

15.     James William Wise (also known as "Lucky") was murdered in the late evening of April 22, 1981 in the Cherry Hill neighborhood of Baltimore City.  Detectives Donald Kincaid and Edward Brown of the Homicide Division responded and conducted a crime scene investigation.  They conducted the follow-up investigation from the time of occurrence until the conclusion of the case.  Detective Lieutenant Jerry Landsman

was their supervisor responsible for the investigation.  As such, upon information and belief, Landsman would have had ultimate authority concerning the disclosure of the police file to the State's Attorney's Office.

16.     On April 22, 1981, at approximately 8:21 p.m. Officer Daniel Miller received a call to respond to the rear of the Patapsco Park Apartments located at 716 Reedbird Avenue for a shooting.  Upon his arrival he discovered the victim, Mr. Wise, lying on the ground in the rear of 716 Reedbird Ave.  Mr. Wise had sustained a gunshot wound to the head and left side of his chest.  He was pronounced dead on the scene by the crew of ambulance number 9.

17.     On the day of the murder, two eyewitnesses were transferred to the offices of the Homicide Division of the BPD and interviewed.  The first, an 18 year-old African American woman named Annie P. Wyche, stated she heard two shots sometime around 8:00 p.m. The shots came from around the back of the apartment buildings. Ms. Wyche related that she walked around to where the shooting occurred and saw a black male with a gun standing about 8-10 feet from her.  The man was carrying the gun down along-side of his leg.  She stated the gun looked like a shotgun.  Ms. Wyche stated the man walked up the street at Cherryland and "up the big steps to Bethune Road."  Ms. Wyche provided a description of the man and stated affirmatively that she would be able to identify him.  She also stated that she thought she may have has seen the man before in the Cherry Hill Shopping Center.

18.     The second eyewitness, a 17 year-old African American male named Mark Williams, stated that he was coming from the Cherry Hill Shopping Center and was walking behind the apartments when he observed a black male in his 20's standing over the

victim near the victim's head.  The man then walked around to the victim's feet and pulled the victim across the ground from where he was lying.  The man stated to Mr. Williams, "Go the other way because I don't want you to see what's over here."  Mr. Williams ran to a friend's house and had them call the police.  Mr. Williams provided a description of the suspect to the police.

19.     Based on the observations of Ms. Wyche and Mr. Williams, the shooter was described in police records as a "black male, 18-20 years, 5'6" to 5'8", medium build, small bush, blue levi jacket, cranberry pants, cream sweater, glasses, and starting a mustache."

20.     On the day of the murder, Detective Edward Brown spoke with Mr. Wise's sister, Sherran Bell, a 35 year-old African American woman, and provided her with the description of the suspect.  Ms. Bell stated that the description fit that of a Wendell Griffin, a black male who lived somewhere on Bethune Road.  (In a later application for a search warrant, Detective Kincaid described Wendell Griffin as a 27 year-old black male, 5'11", 155 lbs.)  Ms. Bell told Detective Brown that a girl named "Paula" said that she saw the victim, Mr. Wise, walking with Wendell Griffin heading in the direction of the apartment building just prior to the shooting.

**The Exculpatory Photo-Arrays**

21.     With that information, Detectives Kincaid and Brown began to focus on Mr. Griffin as a suspect.  They constructed a photo array that included a picture of Mr. Griffin and showed it to Ms. Wyche and Mr. Williams.  Neither was able to identify anyone. But Ms. Wyche, pointing to the photograph of Wendell Griffin, stated, "it looks just like him, *but it's not him*."

22.    The only photograph on file with the police of Wendell Griffin at that time was from

1972, making the photograph in the array nine years old.  Thinking that might

account for the witnesses' failure to identify Wendell Griffin as the suspect in the

shooting, Detective Kincaid determined to obtain a more recent photograph of Mr.

Griffin so he could conduct another photo array.

23.    In May of 1981, Detectives Kincaid and Brown went to the home of Ms. Wyche and

showed her an array of photographs that contained the most recent photograph of

Wendell Griffin.  She was still unable to identify Wendell Griffin as the person she

had seen carrying a gun on the night of the murder.

24.    The documents produced in 2011 do not indicate whether Mr. Williams was shown

the latest picture of Mr. Griffin, and at trial the State did not ask him to attempt an

identification of Mr. Griffin.  The State suggested, however, that the circumstances of

Mr. Williams' encounter with the person dragging the body of Mr. Wise made it

impossible for him to identify the suspect.  Evidently, the detectives who first

interviewed Mr. Williams thought differently, which is precisely why they showed

Mr. Williams a photo array on April 22, 1981, that included Mr. Griffin's photograph.

25.    Moreover, the State's suggestion to the jury that he did not have an opportunity to

view the suspect lends support to the position that the Detectives never shared this

information with the State's Attorney.  The Detectives' simply suppressed the photo

array in which Mr. Williams' failed to identify Mr. Griffin.

**The Exculpatory Evidence and a Pattern of Obfuscation**

26.    Soon, the Detectives identified "Paula," whose hearsay statement that Mr. Griffin was

seen with Mr. Wise just before the murder was repeated by Mr. Wise's girlfriend to

the police on the night of the murder.  But, when they interviewed Paula on May 19,

1981, she explained to the police that she did *not* see Mr. Wise with Mr. Griffin just

before the murder around 8:00 p.m., rather, she saw him much earlier at 6:00 p.m.  In

their report, Detectives Kincaid and Brown noted, "If Paula is being truthful and did

see Wendell and the victim at 6 P.M. this is not beneficial as the victim was killed

around 2021 hours."

27.     Also, by then, the Detectives had obtained conflicting statements from Anthony Jeter

and Michael Brown (a suspected owner of a hat recovered at the crime scene) that

further undermined any reasonable level of confidence that Mr. Griffin was with Mr.

Wise just before he was shot: each put the other in the company of Mr. Wise shortly

before his murder. Anthony Jeter told police that he "last saw the victim in company

with Michael Brown walking toward the woods behind the Patapsco Apartments."

Soon after, he said, he heard shots.

28.     Michael Brown told police that he left Mr. Wise and Mr. Jeter at around 7:10 p.m.

because they were going to get high and did not have enough heroin to include Mr.

Brown.

29.     The significance of Ms. Wyche's exclusion of Mr. Griffin as a suspect in two photo

arrays is magnified when the details of her opportunity to view the suspect are

considered in the context of the thin and contradictory evidence that the police relied

on to inculpate Mr. Griffin.

30.     Detective Kincaid evidently found Ms. Wyche to be a credible witness because he

relied on her physical description of the suspect in an affidavit for a search warrant

for Mr. Griffin's residence and vehicle.  The July 1, 1981, affidavit, however, omitted

an important aspect of Ms. Wyche's identification evidence: Detective Kincaid did not disclose in it that Ms. Wyche *twice* excluded Mr. Griffin as a suspect.

31.     Detective Kincaid's suppression of the results of two photo arrays conducted with Ms. Wyche is particularly egregious because he relied on her physical description to purposefully mislead the judge into believing that the suspect could be Mr. Griffin, when, in fact, Ms. Wyche twice said it was *not* Mr. Griffin.  Detective Kincaid's suppression of Ms. Wyche's (and Mr. Williams') photo array results to a judge makes it clear that this direct, exculpatory evidence was also suppressed from the State's Attorney.

32.     Upon information and belief, in 1981 the BPD maintained a policy that it was not required to turn over the statements of witnesses to the prosecution unless the witnesses were to be called to testify at trial.  The practical result was that even if the statements contained *Brady* information, and especially if, as here, the *Brady* information contradicted the police detectives' theory of the case, they were simply not turned over.

33.     This policy was supported by the State's Attorney's Office for Baltimore City, which maintained its own policy that the prosecution was *not* required to produce witness statements as part of any pretrial discovery process unless the witness was called by the State to testify, and even then only at the conclusion of the direct exam.  While the State's Attorney's Office did recognize its general obligation to produce *Brady* material to the defense, its policy of withholding witness statements created a serious risk for the violation of this legal obligation.

34.     The State's position that it was not required to produce witness statements as part of

pretrial discovery was made clear during a colloquy with the trial judge during the defense case to address Mr. Griffin's objection to the prosecutor crossing a defense witness (Mr. Jeter) with the witness' own statement provided to the police, but not to the defense.  Relying on Leonard v. State, 46 Md. App. 631, 421 A.2d 85 (1980), the Assistant State's Attorney argued that the State need not produce a statement until after the witness has testified on direct examination, and only then may the defense review that statement for purposes of cross-examination.

35.     The exculpatory value of the suppressed results of three photo arrays is evident when considered in the context of the other evidence in this case.  The detectives focused their search for a suspect on Mr. Griffin based on conjecture and "talk" in the Cherry Hill neighborhood.  Detectives interviewed approximately 20 witnesses through the course of their investigation, but none of these witnesses placed Mr. Griffin at the scene of the crime.   No blood or other forensic evidence linked Mr. Griffin to the homicide.  A .30-30 shell casing was found in a pool of blood near Mr. Wise's body, but no firearm was ever recovered from Mr. Griffin. The other physical evidence was a ball cap recovered near the victim and a set of keys that were found on a footpath approximately 30-35 yards away from the crime scene.  There were conflicting accounts about who was last seen with the victim; whether the hat from the crime scene belonged to Mr. Williams; and whether the victim had just hit his lottery "numbers" that day and was flush with cash, or if there was a drug debt to settle.

36.     At trial, the State established a link between the keys recovered near the crime scene and Mr. Griffin's apartment and automobile.  But Detective Kincaid perjured himself when he testified that he had overseen the recovery of the keys and that the chain of

custody had been maintained.  In fact, the police had returned the keys to the family of the victim thinking that they had belonged to him.  Only later did the family provide a set of keys to the police, which were then used as evidence against Mr. Griffin.  The break in the chain of custody was never disclosed to Mr. Griffin, and, on information and belief, was never disclosed to the State's Attorney.

### Bolstering Two Key Witnesses: Delores Queen and Stephanie Moulden, and Suppressing the Rest

37.     The Detectives next focused their attention on a witness named Delores Queen.  On May 20, 1981, Detectives Kincaid and Brown interviewed Denise Queen, Delores' sister.  Denise stated that she had been told by Delores that she had seen Wendell and his brother run into an apartment building on the 900 block of Seagull Avenue and that Wendell was carrying a rifle.  Denise reported that Wendell had pointed the gun at Thomas Davis and stated, "What the f*ck are you looking at?"

38.     Police efforts to locate Delores at her home on June 22, 1981, were not successful, but on June 23 she was interviewed at the Homicide Division office by Detective Kincaid.  Her statement provides, "I was sitting on the front porch of my sister Barbara's house at [redacted]. I saw 'WENDELL' coming down from the houses across the street in the 800 Block of Seagull Ave.  He was limping.  Then a blue car pulled up with two black males in it. They handed Wendell a hunting rifle from the passenger side of the car.  Then the two black males got out of the car and all three of them went into the apartment building that Wendell's sister lives in.  About 5 minutes later all three of them came out of the apartment building.  The two guys got in the car and drove off and Wendell walked south on Seagull Avenue, toward Spellman Rd.  About 15 minutes later after I saw Wendell leave his sister's apartment building

one of the neighbors said that Lucky had been killed." Asked whether anyone else was with her when she allegedly saw Wendell "go into his sister's house with the rifle," she answered, "Yes, Thomas Davis, it was a whole lot of people out there. I can't think of their names now." Detective Kincaid then asked Ms. Queen to identify Mr. Griffin in a photo array.

39.   The police then interviewed every person they could identify and locate from the group of people with Delores Queen, but they all contradicted her statement in various ways.

40.   Thomas Davis was interviewed on June 23, 1981 at 10:51 a.m. He identified Curland Jordan, "Towanda," Vera Harris, Ronald Langley, Billy Stapples, Denise Queen and Delores Queen as having been present. He stated that he *did* see a man with a rifle exiting an apartment in the 900 block of Seagull Avenue and described what he was wearing. He said the man walked towards him such that Mr. Davis had to "get out of his way" and that he entered a car with some other men. Significantly, Mr. Davis told police that he in fact knows Wendell, *but that he did not see him that night at all*. The Detectives suppressed this exculpatory statement.

41.   Roy Pugh was interviewed on June 24 at 10:02 a.m. by Detective Kincaid. Mr. Pugh stated that he was accompanied by Thomas Davis, Ronald Langley and Billy Staples at 839 Seagull Avenue. Billy Staples and Vera Harris were also interviewed that same day. All three stated that they did not see anyone carry a rifle out of 839 Seagull Avenue.

42.   Billy Staples was interviewed on June 24 at 11:00 a.m. He confirmed that he was with Thomas and Tyrone Davis, Ronald Langley and Roy Pugh. He stated that he did

not see anything related to the shooting and told police "somebody was wrong for putting my name to it."

43.     Tujuana Marie Williams was interviewed on June 29 at 9:56 a.m.  She stated that she was present on Barbara Queen's porch in the 800 block of Seagull Avenue after Lucky was killed and did not see anyone carry a rifle out of Sharon's apartment building.

44.     Ronald D. Langley was interviewed on June 29 at 6:50 p.m.  He told police that he was on Barbara Queen's porch with Roy Pugh, Thomas Davis, Billy Staples and a number of girls.  He stated that he did not see anyone carry a gun out of any apartment.

45.     Upon information and belief, none of these exculpatory statements were ever provided to the State's Attorney, and Mr. Griffin did not receive them until 2011.

46.     Delores Queen's statement and testimony at trial, which wholly favored the police theory of the case but was contradicted by no fewer than six witnesses whose statements were suppressed by the police, can be explained by Detective Kincaid's coercive tactics.  Delores Queen testified, and Detective Kincaid confirmed at trial, that he pressured Ms. Queen to adopt his information, or face the wrath of a perjury prosecution and possible loss of her children.  Plainly, Detective Kincaid considered "cooperation" to mean the witness should confirm the information he is providing to her, or she will face the possible loss of her children for withholding evidence.  Ms. Queen acknowledged in her testimony at trial that she only told Detective Kincaid that she had seen Mr. Griffin with a rifle *after* Detective Kincaid had threatened her with the loss of her children.

47.     Detective Kincaid also bolstered Ms. Queen's testimony by suppressing the
contradictory statement of the one person Ms. Queen mentioned as being able to
corroborate her story: Thomas Davis.  Mr. Davis saw the man with the rifle, knows
Wendell Griffin, and told the police that the man was not him.

48.     In the affidavit sworn to by Detective Kincaid in support of an application for a
search warrant on July 1, 1981, he mischaracterizes the statement taken from Mr.
Davis. The affidavit includes the statement attributed to Mr. Davis that he was present
when a black male came out of Sharon Griffin's home carrying a rifle.  But just as it
fails to include any mention of Ms. Wyche's negative photo arrays, it does *not*
include Mr. Davis' statement that he knows Wendell Griffin and that he did not
recognize the man with the rifle.

49.     The only other witness to testify at trial that she had seen Mr. Griffin with a rifle
before the shooting was Stephanie Moulden.  But she did not come forward for two
months, and when she finally did, she claimed to have a precise recollection of the
time she saw Mr. Griffin.  Ms. Moulden's statement, taken by Detectives Kincaid and
Brown on June 30, 1981, is particularly incredible because she claimed to have
identified Mr. Griffin and heard him make threatening comments from a distance of
approximately 150 feet.  A defense investigator testified at Mr. Griffin's post-
conviction proceeding about the distance from Ms. Moulden's vantage point to where
she claimed to have seen and heard Mr. Griffin, which would have been impossible.

50.     No explanation was provided in the documents produced in 2011 about how it was
that Ms. Moulden suddenly came forward with a precise recollection of the time,
from two months earlier, that she purportedly saw and heard Mr. Griffin from a

distance of 150 feet.  In the context of this case, where the police flagrantly suppressed exculpatory evidence and otherwise exerted tremendous pressure on at least Ms. Queen to tell a version of the "truth" that fit the police view of the evidence, it is reasonable to infer that the police also suppressed impeaching information used to leverage a statement from Ms. Moulden.

**Suppression of Exculpatory Information that Tended to Inculpate Others**

51.     Statements that implicated others, and would have afforded Mr. Griffin the opportunity to challenge the State's evidence with an alternate theory of the crime, were similarly suppressed.

52.     The police recovered a baseball-style hat at the crime scene. The hat had apparent exculpatory significance because Mr. Wise's girlfriend, Vanessa Burley, told detectives that the victim did not wear baseball caps.  Ms. Burley further stated that she knew Michael Brown wore hats identical to the one recovered at the scene, and that, oddly enough, Mr. Brown had approached her to tell her that he *traded hats with the victim* the day he was killed.  Ms. Burley stated to the detectives that the victim would never trade hats with Mr. Brown because baseball hats were not the victim's style.

53.     When the police interviewed Roy Pugh, he stated that he saw the victim around 4:00 p.m. on the day of the shooting wearing a beige colored dress hat with a feather in it.  Mr. Pugh further stated that the victim never wore baseball-style caps and that he knew Mr. Brown always to wear baseball caps.

54.     The suppression of the exculpatory information also made it harder for the jury to believe Mr. Griffin's defense.  Annette Hyman testified that she was with Mr. Griffin

in his apartment at the time that Mr. Wise was killed.  She testified that she arrived at Mr. Griffin's home about 7:20 p.m. and that she was there until 8:45 p.m., when Mr. Griffin drove her home. Mr. Wise was killed at approximately 8:20 p.m.  Ms. Hyman also testified that she had observed Mr. Griffin with a set of keys that were not the same as the ones recovered on April 22, 1981.

55.     Anthony Jeter also testified for the defense. Mr. Jeter knew Mr. Griffin and the victim.  On the night of April 22, 1981, Mr. Jeter saw the victim with Michael Brown. Mr. Jeter was walking towards the Patapsco Apartment buildings around 8:00 p.m. and was aware of Mr. Brown and the victim walking about 25 feet behind him. As Mr. Jeter arrived at the apartments he noticed a man in a yellow raincoat standing next to a wall. After walking into the building, Mr. Jeter heard two gunshots.  Mr. Jeter did not testify to seeing the victim with Mr. Griffin at any time on the night of April 22, 1981.

### FIRST CAUSE OF ACTION UNDER 42 U.S.C. § 1983:
### VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS
### UNDER THE FOURTH AMENDMENT FOR
### UNLAWFUL SEIZURE AND MALICIOUS PROSECUTION

56.     Plaintiff incorporates herein all of the prior allegations.

57.     Defendants Landsman, Kincaid and Brown, either intentionally or with deliberate indifference and/or with reckless disregard of the truth and of plaintiff's constitutional rights, withheld impeaching and exculpatory evidence from the State's Attorney's Office.

58.     Defendants Landsman's, Kincaid's and Brown's actions caused a seizure of the plaintiff unsupported by probable cause.

59.   Criminal Proceedings terminated in the plaintiff's favor when his life sentence was modified to time served and he was released from custody following more than 30 years of incarceration.

60.   Defendants Landsman's, Kincaid's and Brown's actions were conducted in an investigative capacity and outside of the courtroom.

61.    The impeaching and exculpatory evidence in question was material to the plaintiff's defense, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of the trial would have been different.

62.   Defendants Landsman's, Kincaid's and Brown's conduct violated the plaintiff's right against continued seizure without probable cause under the Fourth Amendment, made applicable to the states by the Fourteenth Amendment, of the United States Constitution.

63.   The constitutional rights that Defendants Landsman, Kincaid and Brown violated were clearly established at the time that they violated them and a reasonable person in Defendants Landsman's, Kincaid's and Brown's position would have understood that his conduct was in violation of those rights.

64.   Defendants Landsman, Kincaid and Brown are not entitled to qualified immunity.

65.   Defendants Landsman's, Kincaid's and Brown's conduct was a proximate cause of Plaintiff's prosecution, conviction, and continued incarceration.

66.   By virtue of Defendants Landsman's, Kincaid's and Brown's actions, Plaintiff is entitled to compensatory and punitive damages.

**SECOND CAUSE OF ACTION UNDER 42 U.S.C. § 1983:**
**VIOLATIONS UNDER THE FIFTH AND SIXTH AMENDMENTS**
**FOR VIOLATING PLAINTIFF'S RIGHT TO A FAIR TRIAL**

67.     Plaintiff incorporates herein all of the prior allegations.

68.     Defendants Landsman's, Kincaid's and Brown's actions would shock the conscience

of a reasonable person.

69.     Defendants Landsman's, Kincaid's and Brown's conduct violated Plaintiff's right to

due process and a fair trial under the Fifth and Sixth Amendments, including his Fifth

Amendment Right not to be deprived of his liberty without due process of law, and

his Sixth Amendment right to present evidence in his favor, made applicable to the

states by the Fourteenth Amendment, of the United States Constitution.

70.     By virtue of Defendants Landsman's, Kincaid's and Brown's actions, Plaintiff is

entitled to compensatory and punitive damages.

**THIRD CAUSE OF ACTION UNDER 42 U.S.C. § 1983:**
**(*BRADY v. MARYLAND*, 373 U.S. 83 (1963))**
**VIOLATIONS UNDER THE FOURTEENTH AMENDMENT**
**FOR FAILURE TO DISCLOSE EXCULPATORY**
**AND IMPEACHMENT INFORMATION**

71.     Plaintiff incorporates herein all of the prior allegations.

72.     Defendants Landsman's, Kincaid's and Brown's actions would shock the conscience

of a reasonable person.

73.     Defendants Landsman's, Kincaid's and Brown's conduct violated Plaintiff's right to

due process and a fair trial under the Fourteenth Amendment of the United States

Constitution.

74.     By virtue of Defendants Landsman's, Kincaid's and Brown's actions, Plaintiff is

entitled to compensatory and  punitive damages.

## FOURTH CAUSE OF ACTION: VIOLATIONS OF 42 U.S.C. § 1983
### (*MONELL v. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977))

75.     Plaintiff incorporates herein all prior allegations.

76.     The Detectives were experienced, had handled a significant number of murder cases

and knew that the Constitution required that they disclose all exculpatory and

impeachment evidence to the prosecution so it could be disclosed to the defense.

77.     Nevertheless, Defendant BPD proximately caused the constitutional injury

enumerated in the first two causes of action by a propagating a widespread practice

that is so permanent and well settled as to constitute a custom or usage with the force

of law.

78.     Defendant BPD is liable due to its training and supervision of its detectives that was

so inadequate as to establish a deliberate indifference to the rights of citizens and

because this deficiency caused the constitutional violations enumerated in the first

three causes of action.

79.     Reported and unreported cases from the period of time before and during the events

complained of in this case demonstrate that officers and detectives employed by the

Baltimore Police Department had a policy and practice of withholding exculpatory

and impeachment evidence from prosecutors and criminal defendants like they did in

Mr. Griffin's case, which caused the constitutional violations enumerated in the first

three causes of action.

80.     Upon information and belief, motions were filed and granted during the relevant time

period that demonstrate that the BPD maintained a custom, policy, or practice of

allowing or facilitating the withholding of exculpatory and impeachment evidence.

81.     Police misconduct has been a longstanding and widespread practice in Baltimore – as in many other cities – for decades.  For example, in 1967, Walter Lomax was convicted of the robbery and murder of the proprietor of the Giles Food Market in Baltimore City. The crime was one of many robberies that occurred that month. In an effort to solve the crimes, the police resorted to en-masse lineups at the main police station, which they advertised in the newspaper. Showing up to view the lineups were 75 witnesses to 58 crimes including the Giles Food Market murder.  Citing "evidence of actual innocence," the Court freed Lomax in 2006 after 39 years in prison.

82.     In 2001, following 27 years of incarceration for a murder he did not commit, Michael Austin was freed from prison.  In that case, police reports kept from the defense showed that detectives had at least eight other suspects, but there were no records that they were even questioned.  Statements of four witnesses describing the height of the suspect that would have exculpated Mr. Austin were also withheld.  The crime had occurred in 1974.

83.     In 2008, James Owens was freed after more than 20 years imprisonment for a crime he did not commit when he was exonerated by DNA evidence.  Mr. Owens was wrongly convicted in 1988 for a burglary, rape and murder that occurred in 1987. The Homicide Division of the Baltimore Police Department investigated that case. Indeed, one of the detectives responsible for that case was Jay Landsman, the brother of Defendant Jerry Landsman.  On October 11, 2011, Mr. Owens filed a civil rights case in the Circuit Court for Baltimore City, which case was removed to the United States District Court for the District of Maryland and is now pending before the United States Court of Appeals for the Fourth Circuit.  Mr. Owens' civil case is

predicated entirely on issues very similar to the ones presented here involving, *inter alia*, the suppression of exculpatory evidence by police from prosecutors, and further demonstrates the widespread nature of the practice at the Baltimore Police Department.

84.    Rodney Addison was released in December 2005 after nine years of wrongful incarceration following his prosecution in Baltimore City for a 1996 shooting. Statements of three witnesses had not been turned over to the defense, which would have allowed the defense to demonstrate the witnesses had not testified truthfully. Upon his release, then Baltimore City State's Attorney Spokeswoman Margaret T. Burns agreed that the "case pointed to poorly organized paperwork, *the possibility that not all evidence from police was transferred to prosecutors* and Addison's inadequate legal representation."

85.    It was revealed in 2008 that in at least nine homicides, sex assault and burglary cases, Baltimore police detectives instructed crime lab technicians not to follow-up on convicted criminals' DNA found on evidence at crime scenes because they determined it was not relevant to their investigations.  The State's Attorney stated at the time that it is up to the State's Attorney's Office, not the police, to determine whether unreported hits are relevant to cases.  The State's Attorney acknowledged that "such evidence must be offered to defendants and their attorneys during the discovery phase of their trials so that *it is available to use in their defense*."  Yet the police had taken it upon themselves to obfuscate that evidence.

**WHEREFORE**, Plaintiff prays that the Court enter Judgment in his favor and award him compensatory and punitive damages in whatever amount the Court and jury deem appropriate, plus costs and reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all triable issues.

Respectfully Submitted,

LEVIN & CURLETT LLC

By: _____
Charles N. Curlett, Jr. (Fed. Bar. 28246)
Levin & Curlett LLC
201 N. Charles St., Suite 2000
Baltimore, Maryland 21201
(tel) 410-685-0008
(fax) 410-685-2222
ccurlett@levincurlett.com

*Counsel for Wendell Griffin*